STATE OF MAINE

KENNEBEC, ss.

DAVID SAIT and CLAUDIA SAIT,

Plaintiffs

v.

TOWN OF READFIELD, *et al.*,

Defendants

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. RE-00-46
DHM-KEN- 2/6/2004

**DECISION AND ORDER**

MAR 18 2004

This matter is before the court after bench trial. In October of 2000, the plaintiffs filed a complaint against the Town of Readfield, its town manager and road commissioner and a contractor seeking injunctive relief in regard to maintenance of a drainage easement, damages for overburdening of a drainage easement, damages for taking of property rights, compensation for injury to land, damages for trespass and damages for infliction of emotional harm. Prior to trial, plaintiff dismissed counts IV, V, VI and VII disposing of the claims for statutory damages to land, construction damages to land, trespass and damages for infliction of emotional harm. The town manager, road commissioner and contractor have also been dismissed as parties in the case. There remained, more specifically, a prayer for injunctive relief requiring the town to properly maintain a drainage easement, damages for overburdening of a drainage easement and statutory trespass in accordance with Title 23 M.R.S.A. § 3251.

The Nickerson Hill Road runs east and west in the town of Readfield and terminates at a "T" in its westerly end at the Palmeter Road, formerly known as the Pea Ridge Road. A short distance to the north on the Palmeter Road, the Lane Road commences running westerly. The terrain is such that the highest ground is to the west

in the vicinity of the Lane Road and the land slopes to the east and southeast therefrom. In June of 1998, a major rainstorm in the vicinity dropped up to five inches of rain over a period resulting in substantial drainage problems in the general vicinity of the Palmeter Road in its juncture with the Lane Road and, more particularly, the westerly end of the Nickerson Hill Road. The preexisting drainage structures were insufficient to protect the highway and damage occurred to property within the right-of-way. This insufficiency of structure was known to the town authorities as it had previously experienced "sheet" drainage wherein water, at a volume and rate too large for culverts, drains over and across the highway. Such a condition not only creates a hazard to motorists in warm weather but in marginally cold weather, can create substantial ice on the highway.

In July through October of 1998, a committee of the town developed a plan for reconstruction of the drainage facilities of the highway and various discussions took place between the town officers, the committee, and the plaintiffs. The plaintiffs own property upon which they have their residence easterly of the intersection on the Nickerson Hill Road. Their property is down hill from the Palmeter Road and is separated from the southerly extension of the Palmeter Road by property of another upon which is a pond.

In July of 1998, the town contracted with an engineering firm to do a preliminary flood analysis of the area to determine the nature of the problems which had existed for sometime and to include in the analysis potential methods of alleviating the problems identified. The issue for study was described in the engineer's report as follows:

> The problem area involves a pond (presently used as a fire pond with dry hydrant) and a complex of culverts at the intersections of Nickerson, Palmeter, and Lane Roads which are not sized in proportion to the drainage area received by each. Hence behavior is erratic and different for different sizes of storms. The behavior is most likely modified during the

winter months when snow and ice can be a significant factor in partially obstructing inlets to the structures.

As a result of the courses of action recommended by the professional engineer, the town retained a contractor who made major modifications to the drainage structure in the area in question including enlarging culverts and a catch basin, enlarging drainage ditches with rock lining, creating a "plunge" pool on property of the plaintiffs within a town easement, and paving certain drainage areas alongside the highway. Plaintiffs objected to this activity, even going to the extent of having their attorney serve a notice of trespass on the town. It is clear that even though there was dialogue between the plaintiffs and the town during the formulation of the plan, there is no evidence that the plaintiffs ever approved of the final plan. The plaintiffs complain that the results of the construction is such that in order to reduce the erosion, deposit of sediment and damage to the Nickerson Hill Road, the town has directed all of the natural storm drainage on the property of the plaintiffs, that this activity has overburdened a preexisting drainage and that effectively, it has created new channels of water and wet conditions on land of the plaintiffs not previously affected and diminished the value of their property. They seek to have the court order the town to make further modifications to the drainage plan to protect their property and to prevent the overburdening of the drainage easement and to award them damages for the injury to their land occasioned by the activities of the town in what they allege to be a statutory trespass.

The history of the area insofar as it relates to surface water drainage is highly relevant. In 1978, the area in question was owned by Saunders Mfg. Co., Inc. That company created a development plan called "Hilltop Acres" and consistent therewith recorded a development plan upon survey by D.O. Harriman in the Kennebec Registry

of Deeds on May 4, 1978. On that plan exists the "pond" created by an "earth dam" in the same location as the existing pond. In January of 1984, some six years after the recording of the development plan, Saunders Mfg. Co., Inc. conveyed to the Inhabitants of the town of Readfield:

> A certain easement across parcel number 4 as shown on Plan of Hilltop Acres Phase 1 recorded in the Kennebec County Registry of Deeds . . .

> To construct and maintain a driveway to an existing manmade pond to install and maintain dry hydrants, and to do all other things that may be necessary or desirable in the construction and maintenance of the pond for the purposes of fire prevention and firefighting. Said rights to be used for public health and safety, only.

> The driveway to be located upon a strip of land twenty-five (25) feet wide, the centerline being described as follows . . .

> Said easement area being generally as shown on the above-referred-to plan.

The plan illustrates a culvert running from the westerly side of the Town Farm Road, now an extension of the Palmeter Road, to a ditch on the westerly side of the pond diverting drainage around to the south. The plan also shows a culvert running from the north side of the Nickerson Hill Road to the area of the northeast corner of the pond at the same location as the outlet to the pond and within the 100-foot easement for fire protection described. The plan then shows, by arrows, the water from the pond and the culvert proceeding easterly and southerly between two stonewalls, presently referred to as the cattle path. This cattle path is essentially the westerly boundary of the Sait property.

When the town undertook the construction in the Fall of 1998, it increased the capacity of the catch basin and culverts such as to channel the storm drainage both to the uphill side of the pond, southerly side of the pond and the culvert leading into the town easement at the northerly end of the cattle path. At that location, the town also

constructed a "plunge pool." This containment made up of rocks has a damming effect creating a storm pond of approximately 25 feet in length the purpose of which is to attenuate the effects of large volumes of water and to collect sediments just as the pond in question is designed to do. This channeling effect sends a greater volume of water down the cattle path. Over time, the water has diverted from the cattle path downhill through the stonewall and instead of proceeding southerly all the way to an intermittent stream, it is drained on to the rear of the plaintiffs' property both in the improved and unimproved section of their land. There has been testimony, not entirely disputed, that the land of the plaintiffs always has experienced wetness after rainstorms and spring drainage. However, since the reconstruction by the town was designed to and has had the effect of minimizing the amount of drainage going easterly down the Nickerson Hill Road and thereby creating water damage to the highway, it can be reasonably inferred that more water is directed down the cattle path then previously had been experienced.

The plaintiffs are not "babes in the woods" when it comes to some of the land protection issues existing in this case. They both have degrees in sciences related to environmental issues and they are both employed by the State of Maine, Department of Environmental Protection. While they admit they participated in discussions regarding the reconstruction plan to be approved and implemented by the town, it is clear they did not agree with the ultimate plan implemented and, in fact, complain that they did not receive the final approved plan until after it had been initiated thus giving rise to the notice of trespass. However, the fundamental facts are very little in dispute and are best described in the summary and conclusions appearing in the "Supplement to Final Storm Water Analysis for the Nickerson Hill Road Site in Readfield, Maine, for the Town of Readfield, Maine, by John J. Simon, P.E." dated November 18, 1999:

Careful examination of the figures shown in consideration of the history of the area appear to indicate that the issue is a legal one involving who is responsible for what, and the limits on legal rights of a town to maintain and upgrade drainage systems associated with local roads.

The existing erosion along the Sait property and the associated deposition of sediment is a 'fixable' situation. The crux of the matter seems to be who is responsible for correcting this long standing condition, the town or the present landowners. In summary, the data available to the author and the analysis presented do not clearly indicate culpability on anyone's part but does indicate that an inappropriate decision was made by the builder of the pond some 40 to 50 years ago on where to divert the overflow from the pond. The effects of that decision are the crux of the present situation.

As further stated in the engineer's observations, the ultimate and best solution to the problem for everyone's concern is to move the out flow from the pond to its southerly limits and to divert all of the expanse of storm water in the area southerly along the Palmeter Road to a location southerly of the pond such that all water will be diverted into the intermittent stream considered a State Jurisdictional Stream subject to regulation.

Plaintiffs seek injunctive relief ordering the defendants to maintain the drainage easement located on the plaintiffs' property and argue that the defendants fail to properly maintain the easement in accordance with 30-A M.R.S.A. § 3403. That statute provides:

> After a public drain has been constructed and any person has paid for connecting with it, the municipality shall maintain and keep it in repair to afford sufficient and suitable flow for all drainage entitled to pass through it, but its course may be altered or other sufficient and suitable drains may be substituted in its place. If the municipality does not so maintain and keep it in repair, any person entitled to drainage through it may have an action against the municipality for damages sustained by the municipality's neglect.

To this claim, the defendants respond citing *Dyer v. South Portland*, 111 Me. 119; 88 A. 398 (1913). In that case, our Court was called upon to decide the legislative meaning of the phrase "drainage entitled to pass through it" when faced with the question whether

catch basins, designed to carry off surface water, and, at that time, part of the sewer system, was such as to come within the statute.[1] The Court asked the question:

> Now what is the statutory duty of the town, for failure in the performance of which the town is made liable? It is to maintain a sewer so as to afford sufficient and suitable flow for 'all drainage entitled to pass through it.' Did the legislature mean to make towns which have catch basins liable for failure to keep them in such condition that surface water can pass through them into the sewer, or merely for failure to keep the sewer proper, within the limits of its capacity, in such condition that drainage or sewer from lands of persons who have paid to connect with it may pass through it? In the first place, is surface water 'drainage' within the meaning of the statute?

The Court goes on to then examine the statutory scheme of the sections preceding the language in question. It notes the statute providing for the construction of sewers, the taking of land, the assessment and payment of damages therefor, landowner connection with the sewer and attendant assessments, permits. The Court concludes that these statutory provisions "are concerned only with the machinery by which the abutter may become entitled to connect with the sewer so that he can flow his drainage or sewage, whichever it be called, from his land to the sewer. Not in the remotest degree is there any reference to any other drainage." In the final analysis, the court decided:

> When an abutter has paid an assessment, or has received a permit and has connected with the sewer, he is entitled to have *his* drainage pass through it, and the town is bound to keep the sewer in such repair, up to its limit of capacity, that his drainage, so entitled, may pass through it. We hold therefore that a town is not liable under [the then existing statute] for damages caused by surface water, which is prevented from entering a sewer by the clogged and obstructed condition of catch basins, and which in consequence flows upon adjoining land and does damage.

The reconstruction of the preexisting drainage scheme in the area in question in this case and the attendant diversion of additional waters to land of the plaintiffs

---

[1] In this day of sewage treatment plants, storm water systems are separated from septic sewer systems but those developments have come long after many of the cases deciding this issue.

through a preexisting drainage prescriptive easement is not actionable under 30-A M.R.S.A. § 3403 and plaintiffs' claim must fail.

Next, the plaintiffs claim that there has been an overburdening of the preexisting drainage easement as described and cites therefore *Gutcheon v. Becton*, 585 A.2d 818 (Me. 1991). By their claim, the plaintiffs admit that there exists a prescriptive easement southerly on the cattle path for the watershed of the area in question. "A prescriptive easement is established if the claimant can prove 'a continuous use for at least 20 years under a claim of right adverse to the owner, with the knowledge and acquiescence, or by a use so open, notorious, visible and uninterrupted that knowledge and acquiescence will be presumed.'" *Gutcheon*, 585 A.2d at 821, citing *Town of Manchester v. Augusta Country Club*, 477 A.2d 1124 (Me. 1984). *Gutcheon* further explains:

> Whether a prescriptive easement is overburdened is a question of fact, and we review the record to ascertain if there is competent evidence to support the factfinder's conclusions. In general, a person who possesses an easement over another's property can exercise his right only in a reasonable manner.

*See Beckwith v. Rossi*, 157 Me. 532 (1962). Unlike an express easement, whose terms can usually be ascertained from the creating instrument, the permissible uses of an easement acquired by prescription are necessarily defined by the use of the servient land during the prescriptive period. *See McKenna v. Town of Searsmont*, 349 A.2d 760 (Me. 1976).

> In order to remain useful to the dominant estate it serves, a prescriptive right-of-way must encompass some flexibility of use, and adapt to natural and foreseeable developments in the use of the surrounding land. When presented with an alleged overburdening of a prescriptive easement, the factfinder must balance the prior use of the right-of-way established during the prescriptive period against any later changes in the method of use that unreasonably or unforeseeably interfere with the enjoyment of the servient estate by its current owner.

*Gutcheon*, 585 at 823.

Further, *Gutcheon* tells us that *Benner v. Sherman*, 371 A.2d 420 (Me. 1977) recognizes that, "The scope of a prescriptive easement should be so limited as to prevent a clearly foreseeable overburdening." Finally, the Court notes:

> The extent of an easement created by prescription is fixed by the use through which it was created." RESTATEMENT OF PROPERTY, § 477. Although some variation is inevitable, the use made under a prescriptive easement must either be consistent with the general pattern of use that gave rise to the creation of the easement or result from the normal evolution of that use.

*Id.* at §§ 478-479; *Gutcheon*, 585 at 825; dissent of Wathen, J. joined by McKusick, C.J.

Parenthetically, the court notes that according to the Plan of Development recorded in 1978, the outlet to the pond drained in an easterly and southerly manner down the cattle path. While the plan is not clear as to the property line between Saunders Mfg. Co., Inc. and its next easterly neighbor, the cattle path either runs down the boundary line or it exists easterly of the boundary on the land of one Bingham. At 88 A.L.R. 4th, 891, the court finds the following language:

> Under the common-enemy doctrine, adopted by the courts of some jurisdictions, each landowner has an unqualified right to fend surface waters as the landowner sees fit without being required to take into account the consequences to other landowners, or have the duty and rights to protect themselves as best they can (78 Am. Jur. 2d Waters, 120). Differing from the common enemy doctrine is the civil law rule that the owner of the upper or dominant estate has a legal and natural easement or servitude in the lower or servient estate for the drainage of surface water flowing in its natural course and manner; and that such natural flow or passage of the waters cannot be interrupted or prevented by the servient owner to the detriment or injury of the estate of the dominant proprietor, unless the right to do so has been acquired by contract, grant, or prescription. (78 Am. Jur. 2d Waters, § 121).

The drainage of the pond onto the property of another would appear to have created the prescriptive easement in the manner of a dominant estate draining surface waters on a servient estate. Certainly this appears to be clear as a matter of record as of April 1978.

Plaintiffs also rely upon Title 23 M.R.S.A. § 3251 which reads as follows:

> The municipal officers of a town may at the expense of the town construct ditches, drains and culverts to carry water away from any highway or road therein, and over or through any lands of persons or corporations, when they deem it necessary for public convenience or for the proper care of such highway or road . . . If such town does not maintain and keep in repair such ditches, drains, culverts, the owner or occupant of the land through or over which they pass may have his action against the town for damages thereby sustained.

Plaintiffs cite *Austin v. Inhabitants of St. Albans*, 144 ME 111, 65 A.2d 32 and *Whalen v. Town of Livermore*, 588 A.2d 319 (Me. 1991). These cases confirm the requirement in the statute of a municipality to maintain and keep in repair ditches, drains and culverts. Unfortunately, in each of those cases, there was no evidence that any ditch or drain was ever legally constructed by the town. However, the language in *Austin* is of assistance. At 65 A.2d 34, the Court says:

> If a ditch is constructed by legal act of the municipal officers of a town, and is not large enough to care for the water, there is no remedy under this statute. It is only through failure to maintain and keep and repair such ditch, as it was constructed by the municipal officers, that the resulting damage can be recovered. The municipal officers do not act under the statute under agents, and if damage results from insufficient size of a ditch, or other fault in original plan of construction, the town is not liable. When municipal officers act judicially as a statutory board, the town is not for its honest errors of judgment. There must be a failure to repair, to maintain, to the standard of efficiency of its original plan of construction.

*Keeley v. Portland*, 100 Me. 260, 61 A. 180; *Davis v. Bangor*, 101 Me. 311, 64 A. 617.

Under the facts of the instant case, the damage claimed by the plaintiffs is the result of the plan of construction not the failure of repair or maintenance. It is contrary to the failure to repair or maintain because it is precisely the nature of the repair of which plaintiffs complain. Further, the defendants point out that consistent with *Whalen v. Livermore*, the town has never constructed the drain over the property of the

plaintiffs, they have simply channeled the water to an existing drain created by the existence of the pond.

*Darling v. City of Bangor*, 68 Me. 108 (1878) tells us that principles of law applicable to the liabilities of cities and towns are somewhat settled.

> Municipal corporations are endowed with certain judicial or quasi-judicial powers, to be exercised, not for their private convenience or profit, but as part of a public duty, for the furtherance of those things necessary or convenient to the community at large. Performance of these duties, involving as they do the exercise of judgment as t time and manner of accomplishment is a general rule imposed no liability to an action for private injury resulting from acts within their jurisdictions. When these acts to be judicial and become ministerial only, then for negligence or omission, an action may be maintained by a person suffering injury thereby. Thus, the maintenance of sewers and drains, if they are necessary to the public health, or to keep roads in safe conditions, comes within these judicial powers; the manner of building and keeping them in repair, are usually considered as ministerial duties.

*Darling* 68 at 109.

Plaintiff claims their right to damages in accordance with Title 23 M.R.S.A. § 2103:

> When any real estate is damaged by the use and control for highway purposes of such land outside the existing improved portion and within the limits of one and half rods on each side of the center of the travel portion, they shall award damages to the owner as provided. . .

The court has examined the evidence presented to it. The plaintiffs have not presented any evidence sufficient to meet its burden of proof that the construction undertaken by the town as complained of was either outside of the three-rod limits of the highway or outside of the easement granted to it by the Saunders Mfg. Co., Inc. which it had a right to maintain.

In the final analysis, the court concludes, as indicated by the professional engineer, that the solution to the problems of the plaintiffs are rather clear. The issue is whether plaintiffs have met their burden of establishing, as a matter of law,

responsibility in the defendant for either the cost of fixing the problem or, more appropriate to the cause of action, the difference between the value of the plaintiffs' land as it is now exists compared with its value prior to the construction in the Fall of 1998. Since the historical drainage previously existed and there has been no evidence established of before and after value, the court would be required to find a duty on the part of the town to generate a manmade drainage where none previously existed in order to elevate the value of land to the plaintiffs by diverting the natural storm water to a preexisting stream. Given the facts as they had been presented to the court and the law as the court understands it, the court concludes there is no such duty nor has there been such a change in circumstances off the prescriptive drainage easements such that it was not foreseeable, at the very least when the easement was created by the installation of the initial culvert and the fire prevention pond.

For all the reasons expressed herein, the entry will be:

Judgment for the defendants.

Dated: February 6, 2004

Donald H. Marden
Justice, Superior Court

DAVID SAIT  - PLAINTIFF

Attorney for: DAVID SAIT
CLIFFORD GOODALL
DYER GOODALL AND FEDERLE LLC
61 WINTHROP ST
AUGUSTA ME 04330


CLAUDIA SAIT  - PLAINTIFF

Attorney for: CLAUDIA SAIT
CLIFFORD GOODALL
DYER GOODALL AND FEDERLE LLC
61 WINTHROP ST
AUGUSTA ME 04330



vs
TOWN OF READFIELD - DEFENDANT

Attorney for: TOWN OF READFIELD
LEE BRAGG
BERNSTEIN SHUR SAWYER & NELSON
PO BOX 5057

AUGUSTA ME 04332-5057

GREGORY GILL  - DEFENDANT

Attorney for: GREGORY GILL
LEE BRAGG
BERNSTEIN SHUR SAWYER & NELSON
PO BOX 5057

AUGUSTA ME 04332-5057

WILLIAM ROURKE  - DEFENDANT

Attorney for: WILLIAM ROURKE
LEE BRAGG
BERNSTEIN SHUR SAWYER & NELSON
PO BOX 5057

AUGUSTA ME 04332-5057

**DOCKET RECORD**

Filing Document: COMPLAINT
Filing Date: 10/27/2000

Minor Case Type: TRESPASS

# Docket Events:

08/16/2002 FILING DOCUMENT - COMPLAINT FILED ON 10/27/2000

08/16/2002 NOTE - PRIOR ENTRIES IN MANUAL DOCKET ENTERED ON 10/27/2000

08/16/2002 Party(s):  DAVID SAIT
          ATTORNEY - RETAINED ENTERED ON 10/27/2000